**Opinion issued November 6, 2025**



In The

# Court of Appeals

**For The**

# First District of Texas

———————————

## NO. 01-25-00394-CV

———————————

## IN THE INTEREST OF D.T. AND M.B.M.V. A/K/A M.V., CHILDREN

———————————

### On Appeal from the 313th District Court
### Harris County, Texas
### Trial Court Case No. 2024-01052J

———————————

### MEMORANDUM OPINION

The Texas Department of Family and Protective Services sought to terminate the parental rights of C.V. (Mother) to her daughters D.T. (Diedra) and M.B.M.V. *a/k/a* M.V. (Michelle).[1] After a bench trial, the trial court found by clear and

---

[1]    In this opinion, we use pseudonyms for the minor children and their family members to protect their privacy. *See* TEX. R. APP. P. 9.8(b)(2). We use the same pseudonyms for the children that the parties use in their appellate briefs.

convincing evidence that five statutory predicate grounds supported termination of Mother's parental rights, and it further found that termination was in the children's best interest. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), (J), (N), (O), (b)(2). The trial court signed a final decree terminating Mother's parental rights to Diedra and Michelle and appointing the Department as the children's sole managing conservator.

In two issues, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's findings that termination is warranted under subsections (D) and (E) and its finding that termination of her parental rights is in the children's best interest.

We affirm.

## Background

### A. The Events Leading to this Termination Proceeding

Mother has ten children, seven of whom are adults and three of whom are minors. Diedra and Michelle, the two children involved in this case, are Mother's two youngest children. Diedra was born in 2014 and was eleven years old at the time of trial. Michelle was born in 2017 and was seven years old at the time of trial. Although Mother has guardianship over one of her adult children, none of her minor children currently live with her. The Department had been involved with eight of

Mother's children over the years, but no court had ever terminated her parental rights.

The Department first became involved with Mother and her family in 2006. Three of Mother's children under the age of four were the subjects of this first referral. The referral reported that Mother did not work, the electricity had been off at the home for approximately two weeks, concerns existed that the children were not being fed, the children were "always dirty," and the children were not dressed appropriately for cold weather. The removal affidavit for the underlying case, which the trial court admitted into evidence at trial, reflected that the Department could not resolve the first referral involving Mother because the family had moved.

Over the next sixteen years, the Department received multiple referrals concerning Mother's family. These referrals included allegations that Mother intentionally tried to hit a police vehicle with her car while her children were in the car; Mother inappropriately disciplined two of the children; Mother was not adequately protecting a child from injury; Mother was acting "bizarre" and violent toward her boyfriend; one of the children "looked dirty" following a medical procedure; a child might have been locked inside a car overnight; Mother had been

3

using methamphetamine and selling marijuana; and the family residence was filthy and lacked usable toilets.[2]

In January 2024, the Department received a referral that ultimately led to the filing of this proceeding:

> On January 17, 2024, [the Department] received a report that [Michelle] (age 6) is still in diapers for an unknown medical condition. Mother, [C.V.], has been observed drinking and doing drugs like cocaine, crystal methamphetamines, and marijuana. There are cars that come and go to [Mother] all the time and [Mother] gives them stuff that is suspected to be drugs. Both children, [Michelle] and [Diedra], are running around without supervision in the dark even at 2:00am. Both children ride their scooters right on the street with cars coming and going. The children do not attend school. [Mother] is staying in a tent and shed of an abandoned home. The owner lets her rent the back side shed. The shed has no working utilities or running water. There is no way for the family to stay warm and there is no electricity. There is trash everywhere and some aluminum thing. [Michelle] takes some type of medicine and doesn't eat much. [Michelle] is very skinny. Both children have dirty hair, wear the same clothes for 2 weeks at a time, and look like they haven't bathed in a long time. Both children come asking neighbors for food and to bathe. Both children say that there is no food in their home. [Mother] gets SSI benefits for both children and food stamps but [it is] unclear what she does with it.

The Department began investigating. The day after the referral, an investigator met Mother and the children, who were living in a "travel trailer" on the property. The house on the property was locked and abandoned.

---

[2] The Department "ruled out" most of the referrals, but it found "reason to believe" two referrals: (1) the allegations that Mother tried to strike a law enforcement vehicle with her car while her children were in the car, and (2) the allegations that one of Mother's children was locked in a car overnight.

4

Two months later, in March 2024, the investigator again met with Mother and the children. Mother informed the investigator that they had a room at a motel, and the "owner of the motel has been letting them stay there and [Mother] pays as she can." Mother anticipated receiving an income tax refund, and she hoped to find more permanent housing. Approximately one month later, Mother and the children "were at the property still gathering more of their belongings in order to get out everything by the deadline provided by the landlord." The Department required Mother to complete a drug test on this date, which Mother did. Mother tested positive for amphetamines and methamphetamine.

The Department received a second referral in April 2024:

On April 13, 2024, the Department received a report that [Mother] contacted 911 and said someone was stalking her. She was located by officers in the car with both of her children and a dog. The children looked dirty and when asked, the children said they had not eaten. [Mother] stated that they could not go home because "people are doing stuff over there." [Mother] also stated the home has no water. [Mother] was not making sense when asked about who was stalking her and she also claimed that the police had been shooting at her. She seemed paranoid, delusional and was possibly having some type of mental health episode. She was convinced to allow the children to go stay with their maternal grandmother and they were dropped off there. [Mother] stated she wanted to check herself into a hospital and said she was going to but it is unknow[n] if she actually did.

A different Department investigator responded to this referral and, over the next few days, spoke with Mother, her mother, a neighbor, and the children.

5

During this investigation, the Department learned that Diedra and Michelle were not enrolled in school. Mother's mother informed the investigator that the children could not stay with her because her apartment had flooded. The investigator had difficulty finding a good address for Mother. Using information from an old case, the investigator spoke with a neighbor who relayed that Mother had lived across the street, but she had been "kicked out today due to her not taking care of the property."

The investigator located Mother after receiving information that Mother "was living in tents behind a business." When the investigator found Mother, Diedra was with her and Michelle was with another person at the encampment. Diedra was "covered in dirt" and had insect bite marks on her legs. The encampment had no running water or electricity. Mother's mental state was "concerning" because she "was unable to focus on the questions being asked and she continued to ramble about things that did not make sense or had to do with the conversation." Mother requested that the children not stay at the encampment with her, and Mother's sister agreed to take the children for a couple of days.

The following day, the investigator again spoke with Mother, who reported that Diedra had ADHD and Michelle "was born without a vagina or anus and was

taken to a lab where they had to make her a vagina and anus."[3] She also informed the investigator that she had three other minor children who did not live with her. She stated that she was self-employed and "collects scrap for money." Mother acknowledged drug use in the past, specifically crack cocaine, but denied any current drug use aside from taking Adderall for ADHD. She denied having any mental health conditions, stating that she had been incorrectly diagnosed with schizophrenia. Mother told the investigator "about someone trying to follow her and steal her information" and that "there are crooked police officers that are out to get her." The investigator attempted to contact the children's father, but she "was informed that pre-Covid he was reported [as] a missing person because he just kind of vanished" and no one had heard from him.

The Department then initiated this termination proceeding. It sought termination of Mother's parental rights to Diedra and Michelle on several statutory predicate grounds, including subsections (D), (E), (J), (N), (O), and (P).

Two months after filing suit, the Department created a family plan of service for Mother. According to the service plan, ten-year-old Diedra was healthy with no

---

[3]     After the children were removed from Mother's care, Michelle was taken to the hospital for a health screening. Her medical records reflected that she had a "past medical history of imperforate anus status post [surgical] repair." Michelle also had an "innocent" heart murmur. She was "medically cleared" for discharge by hospital staff, and the Department was directed to follow up with Michelle's primary care physician.

physical disabilities, but she "will be retained to the 4th grade due to how far behind she is in school." Six-year-old Michelle had received reconstructive surgery on her anus, which was successful, but she still had lingering problems with incontinence. She had unspecified developmental delays but would begin first grade in the next school year.

With respect to Mother, the service plan identified two primary areas of concern: her substance use (which included two prior convictions for possession of a controlled substance) and her inability to maintain stable housing. The service plan required Mother to maintain employment and "a safe and stable home for her children, free of drugs, abuse, neglect, and anything that would pose a danger of abuse or neglect to the children." The service plan also required Mother to complete a substance abuse assessment and complete drug testing when requested by the Department. The plan mentioned that Mother "has a history of mental health instability," including paranoia and delusions, and required her to undergo psychosocial, psychiatric, and psychological evaluations plus begin counseling. Finally, the service plan required Mother to complete parenting classes, specifically classes that "address age-appropriate behaviors, developmental stages, and child nutrition."

**B.      The Trial Evidence**

A bench trial occurred before the associate judge. The documentary evidence included the removal affidavit; a January 2025 complaint from Harris County charging Mother with possession of between 4 and 200 grams of methamphetamine; a March 2025 "Bond Condition Violation Report" stating that Mother had violated a condition of her pretrial release by testing positive for amphetamines and methamphetamine; a March 2025 report from Child Advocates recommending that the trial court terminate Mother's parental rights; a March 2025 permanency report completed by the Department that described the children's progress in their foster placement; and Michelle's hospital records from April 2024.

Three witnesses testified at the bench trial: the Department caseworker, Mother, and the Child Advocates representative. The caseworker testified that at the time the children were removed from Mother's care, the family home was "unlivable," the girls "were ungroomed and unkept," and they had been living in "bugs and other infestations," including lice, for "a long period of time." The caseworker agreed that the children "were essentially living in squalor," with no electricity or running water, and they often roamed around without supervision, even in the early morning hours. At the time of removal, neither of the girls knew the alphabet or the names of colors.

9

Diedra was "doing well" in the foster placement. Although the Department had some unspecified "concerns regarding her medical,"[4] she was developmentally "on target." Diedra had learned to read and had made great progress academically with some extra help from her foster mother.[5] She participated in swimming and other extracurricular activities. She also attended therapy sessions and had become "more open and more communicative since being placed." The caseworker agreed that Diedra was "thriving" in the foster placement.

Michelle had "more extensive" medical complications than Diedra which affected her daily living. Specifically, she continued to have incontinence problems which affected her ability to take swimming lessons with Diedra. The Department had recommended that Michelle see a gastroenterologist for a possible additional surgery, but Mother had not provided information about Michelle's prior medical

---

[4]  The caseworker later testified that Diedra had a problem with bed-wetting, and she indicated that Diedra, like Michelle, had had surgery before entering the Department's care. It is unclear from the testimony whether the bed-wetting was the "concern regarding [Diedra's] medical" that the caseworker had alluded to in her earlier testimony, but the Department's permanency report and the Child Advocates report both stated that Diedra had this issue.

[5]  The Child Advocates representative testified that Diedra receives some special academic accommodations, including extra time on assignments. She had not yet caught up on the grades she had missed, but she had no identified intellectual or academic disabilities. Her school's "understanding is she is capable of completing the work, it's just that she's kind of catching up to it."

history. Aside from her ongoing medical concerns, Michelle was "doing very well" and she had good grades.[6]

During questioning by the children's ad litem attorney, the caseworker elaborated on the girls' progress in therapy. When they first began therapy sessions, they were both "very timid and shy," they did not speak much, and they did not make much eye contact. The girls "were not very socialized." By the time of trial, they were talking and expressing themselves in full sentences. The Department's concerns about their socialization "ha[d] been decreasing."

The caseworker testified that Mother had not been involved with the Department during the pendency of the case. Her whereabouts had been unknown, and Mother had only recently spoken with the caseworker. The caseworker had difficulty establishing regular communication with Mother. The caseworker later learned that Mother was incarcerated on a drug-related charge. Mother had not completed any of the tasks required in her service plan, nor had she regularly visited with the children.

The Department believed that termination of Mother's parental rights was in Diedra and Michelle's best interest. Its goal was for the girls' current foster

---

[6] The Child Advocates representative testified that Michelle was writing and "attempting to spell sight words."

placement to adopt them. Diedra and Michelle had been in that placement for almost a full year.

Mother testified about Michelle's medical needs and care. She stated that Michelle had had eleven doctors, but "[i]t wasn't like normal doctors. It was medical science." On questioning from the trial court, Mother agreed that "medical science doctors" was "sort of a group of doctors" that had helped Michelle. Her understanding of Michelle's medical condition was that she was "the first baby in 50,000 years that was born without an identity," meaning no genitals, urethra, or anus. Michelle needed specialized treatment immediately after her birth, and she stayed in the hospital for around four months. Mother received special training on how to care for Michelle "[w]ith the medical science people in the hospital." She testified that she took Michelle to all her medical appointments.

Mother acknowledged that she was presently incarcerated and that she tested positive for methamphetamine, which led to revocation of her bond. She testified that she should be released from jail later in the month "when [she] go[es] to court," and she had a possible place to live following her release: a trailer home owned by a friend.[7] She agreed that her criminal history dated back to 1997, when she had a conviction for possession of crack cocaine. Between 1998 and 2005, Mother

---

[7] Mother testified that one of her adult children—a son she had guardianship over due to a disability—lived at this address, and Diedra and Michelle would be able to live there as well.

received an unlawful carrying of a weapon charge, three possession of crack cocaine charges, and two theft charges. She had a federal conviction in 2010 for conspiracy to transport undocumented persons within the United States, and she served around two years in custody for that offense. She also had two recent charges for possession of methamphetamine: one in 2022 and one in 2025, which was the pending charge at the time of the termination trial. Mother testified that she regularly used prescription drugs while the children were in her care, and she had "always used" methamphetamine "because it's [her] prescription."

Mother did not agree that she had not cooperated with the Department. She testified that she had called her caseworkers and inquired about services, but she did not have any money. She also testified that she had completed a parenting class, but she did not provide any information about this class. She further testified that it was not correct that the girls had never been enrolled in school: they had attended a school in Matamoros, Mexico around 2022. The children did not attend school in Houston because Mother "had fear for their life." Specifically, she was afraid of the Houston Police Department because a police officer shot at her in front of the children five years earlier after she "stole something from them."

The trial court questioned Mother about whether she had ever been under the care of a psychiatrist. Mother stated that she had in 1999 in connection with one of her criminal cases, and she also completed a therapeutic program for addiction at

13

that time. She also had a psychiatric evaluation done during a prior conservatorship case involving three of her older children. The evaluator recommended medication, specifically, "[a] lot of medications that I wasn't really going to be able to focus. Medication I couldn't talk or wake up." She took eight or nine medications, including Zoloft, Haldol, and Risperdal. She was still taking some medication at the time of trial, including Trazodone, Gabapentin, and Risperdal. She did not know what conditions those medications were used to treat.

Mother acknowledged that she had not seen the girls since May or June 2024,[8] but she requested that the trial court maintain her parental rights. She wanted to be reunited with Diedra and Michelle upon her release from incarceration, and she believed she could "offer them a better mom, a better me, progress in life." She intended for them to attend trauma classes together. She also testified that she could take care of Michelle's medical needs. Mother testified that she received disability benefits, and she also had been employed as recently as the month before trial, working at an auto body shop.

The Child Advocates representative recommended termination of Mother's parental rights. She had witnessed one visit between Mother and the children in June 2024, and Mother was "engaged and attentive," and they enjoyed each other's

---

[8]     Mother testified that she tried to visit the girls four times at the Department offices at times when a caseworker told her to visit, but the girls were not present.

company. The children had not seen Mother since that visit. The representative visited the girls monthly, and the girls stopped asking about Mother around September 2024. The girls did not ask about any of their older siblings, and the representative was not sure if the girls knew about their siblings. The girls' foster mother wished for them to remain in her home and was open to adopting them.

The trial court ultimately found by clear and convincing evidence that Mother had violated five statutory predicate grounds for termination and that termination of her parental rights was in Diedra and Michelle's best interest.[9] *See id.* The court appointed the Department as the girls' sole managing conservator. This appeal followed.

### Sufficiency of the Evidence

Mother raises two issues on appeal challenging the sufficiency of the evidence to support the trial court's termination findings. She first argues that the Department presented legally and factually insufficient evidence to support the endangerment findings under subsections (D) and (E). She then argues that the Department did not present legally and factually sufficient evidence that termination of her parental rights was in Diedra and Michelle's best interest.

---

[9] The trial court's final decree also terminated the parental rights of the children's alleged biological father, Mother's legal husband (who was not the children's biological father), and an "unknown" alleged father. Only Mother appealed from the trial court's final decree.

15

**A.  Standard of Review**

To terminate a parent's rights to her minor children, the factfinder must find by clear and convincing evidence that (1) at least one statutory predicate ground for termination exists, and (2) termination of parental rights is in the best interests of the children. *In re C.E.*, 687 S.W.3d 304, 308 (Tex. 2024) (per curiam). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007.

When conducting a legal sufficiency review of termination findings, we consider all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction about the truth of the Department's allegations. *In re R.R.A.*, 687 S.W.3d 269, 276 (Tex. 2024); *In re C.E.*, 687 S.W.3d at 308 (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). The factfinder resolves conflicts in the testimony, weighs evidence, and draws reasonable inferences from the evidence that it chooses to believe. *In re C.E.*, 687 S.W.3d at 308–09; *see In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (stating that factfinder is "sole arbiter of the witnesses' credibility and demeanor," and therefore we must defer to factfinder's factual determinations) (quotation omitted). We must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, but we should disregard all evidence that a

16

reasonable factfinder could have disbelieved or found to have been incredible. *In re C.E.*, 687 S.W.3d at 308 (quotations omitted). We may not substitute our judgment for that of the factfinder. *Id.* at 309.

When conducting a factual sufficiency review, we weigh disputed evidence contrary to the finding against all evidence favoring the finding. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). We must determine whether the disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding. *Id.* Evidence is factually insufficient if, in light of the entire record, the disputed evidence that a reasonable factfinder could not have resolved in favor of the finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true. *Id.*

## B. Endangerment Findings

Only one statutory predicate ground and a best interest finding are necessary to support a judgment for termination of parental rights. *In re M.P.*, 639 S.W.3d 700, 702 (Tex. 2022) (per curiam). But termination based on subsections (D) and (E) can form the basis to terminate a parent's rights to another child. TEX. FAM. CODE § 161.001(b)(1)(M); *In re N.G.*, 577 S.W.3d 230, 234 (Tex. 2019) (per curiam). Even if sufficient evidence supports another predicate ground, we must review findings under subsections (D) and (E) when challenged by a parent. *In re N.G.*, 577 S.W.3d at 235 (stating that appellate court's failure to review challenged findings

17

under subsections (D) and (E) "deprives the parent of a meaningful appeal and eliminates the parent's only chance for review of a finding that will be binding as to parental rights to other children").

Here, the trial court found that Mother violated five statutory predicate grounds: subsections (D), (E), (J), (N), and (O). On appeal, Mother concedes that sufficient evidence exists to support all five findings, but she nevertheless challenges the findings under subsections (D) and (E) due to the implications relating to her rights to her other minor child. We review the evidence concerning the subsection (D) and (E) findings and agree with Mother that sufficient evidence supports both findings. We therefore need not address the trial court's findings under subsections (J), (N), and (O). *See In re M.P.*, 639 S.W.3d at 702.

A trial court may terminate a parent's rights under subsection (D) if it finds by clear and convincing evidence that the parent knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child. TEX. FAM. CODE § 161.001(b)(1)(D). Subsection (E) authorizes termination if the court finds by clear and convincing evidence that the parent engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child. *Id.* § 161.001(b)(1)(E).

As used in subsections (D) and (E), "endanger" means to expose a child to loss or injury or to jeopardize the child. *In re R.R.A.*, 687 S.W.3d at 277 (quoting *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)); *In re J.W.*, 645 S.W.3d 726, 748 (Tex. 2022) (quotation omitted). Endanger means more than a "threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment," but a parent's conduct can be endangering even if it is not directed at the child and the child does not suffer injury. *In re R.R.A.*, 687 S.W.3d at 277 (quotation omitted). The factfinder may infer endangerment from a course of conduct that presents substantial risks to the child's physical or emotional well-being. *Id.*; *In re C.E.*, 687 S.W.3d at 310.

Subsection (D) focuses on the child's environment. *In re J.W.*, 645 S.W.3d at 749. Relevant considerations include the suitability of the child's living conditions and the conduct of the parent or others in the home. *Id.*; *see In re R.R.*, 711 S.W.3d 126, 139 (Tex. App.—Houston [1st Dist.] 2024, no pet.) ("[I]nappropriate, abusive, or unlawful conduct by a parent or other persons who live in the children's home can create an environment that endangers the physical and emotional well-being of children as required for termination under subsection (D).") Typically, the relevant time frame for evaluating subsection (D) is before the child's removal from the home. *In re J.W.*, 645 S.W.3d at 749. A single act or omission may support termination under this subsection. *In re R.R.*, 711 S.W.3d at 139.

19

Termination under subsection (E) requires more than a single act or omission; instead, this subsection requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id.* We may consider the parent's actions before the child's birth "while the parent had custody of older children." *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). We may also consider conduct that occurred after the Department removed the child from the parent's care. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

"[A] pattern of parental behavior that presents a substantial risk of harm to the child permits a factfinder to reasonably find endangerment." *In re R.R.A.*, 687 S.W.3d at 278. This behavior can include substance abuse and its effect on a parent's life and ability to parent. *In re J.O.A.*, 283 S.W.3d at 345. Although we should not evaluate evidence of drug use in isolation, "a pattern of drug use accompanied by circumstances that indicate related dangers to the child can establish a substantial *risk* of harm." *In re R.R.A.*, 687 S.W.3d at 278.

A parent's criminal history may also support a finding of endangerment. *In re J.F.-G.*, 627 S.W.3d at 313. Incarceration, standing alone, does not constitute conduct that endangers a child's physical or emotional well-being, but it may support an endangerment finding "if the evidence, including the imprisonment, shows a course of conduct which has the effect of endangering the physical or emotional well-being of the child." *Id.* at 312–13 (quotation omitted).

20

Here, the Department presented evidence that supported the trial court's findings that Mother placed the children in circumstances or surroundings that endangered their well-being and that Mother engaged in conduct that endangered their well-being. The evidence before the trial court included the removal affidavit that the Department completed when it filed its original petition seeking termination of Mother's rights. This affidavit detailed the referrals that led to the Department's involvement with Mother, Diedra, and Michelle, as well as the investigation that occurred after receipt of the referrals. The removal affidavit reported that Mother did not have stable housing but was instead living in a tent in an encampment at the time the children were removed from her care. The tent was infested with bugs and lice, and both children were dirty. The encampment did not have electricity or running water.

Mother acknowledged that her criminal history and her history with substance abuse dated back to the 1990s. She had several drug-related criminal charges and convictions, including a pending charge for possession of methamphetamine that had not been resolved at the time of the termination trial. She agreed that her "drug of choice" was crack cocaine when she was younger, but in recent years she tended to use methamphetamine. She claimed that she had a prescription to use this drug. Mother agreed that she used methamphetamine during the pendency of this case and her criminal case, which led to revocation of her bond and her incarceration at the

21

time of trial. The Department had been involved with eight of Mother's ten children, and none of her minor children lived with her.

It is further undisputed that neither Diedra nor Michelle—who were ten and six years old, respectively, at the time of removal—were enrolled in school. The girls did not know the alphabet, and they had difficulty naming numbers and colors. The removal affidavit also reported that the girls roamed around unsupervised, even at nighttime.

In light of this evidence, Mother acknowledges that "there is no non-frivolous argument to challenge the court's finding that the evidence is legally and factually sufficient to support the endangerment findings pursuant to subsections (D) and (E)." We agree that a reasonable factfinder could have formed a firm belief or conviction that Mother knowingly placed or allowed the children to remain in conditions or surroundings that endangered their physical and emotional well-being and that Mother engaged in conduct that endangered the children's physical or emotional well-being. We hold that legally and factually sufficient evidence supports the trial court's findings under subsections (D) and (E).

We overrule Mother's first issue.

## C.   Best Interest Finding

In addition to proving at least one predicate ground for termination, the Department must also prove by clear and convincing evidence that termination of

the parent's rights is in the children's best interest. TEX. FAM. CODE § 161.001(b)(2). A "strong presumption" exists that keeping the children with a parent serves the best interests of the children. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). But this presumption is not absolute. A presumption also exists that "the prompt and permanent placement of the child[ren] in a safe environment" is in the children's best interest. TEX. FAM. CODE § 263.307(a).

This inquiry is "child-centered and focuses on the child's well-being, safety, and development." *In re J.W.*, 645 S.W.3d at 746 (quotation omitted). We consider several non-exclusive factors in determining whether termination is in a child's best interest, including:

(1)  the desires of the child;

(2)  the child's emotional and physical needs now and in the future;

(3)  the emotional and physical danger to the child now and in the future;

(4)  the parenting abilities of the individuals seeking custody;

(5)  the programs available to assist those individuals to promote the child's best interest;

(6)  the plans for the child by those individuals or by the agency seeking custody;

(7)  the stability of the home or proposed placement;

(8)  the parent's acts or omissions that may indicate the existing parent-child relationship is improper; and

(9)  any excuse for the parent's acts or omissions.

*Id.* (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). We may also consider the statutory factors set out in Family Code section 263.307, which the court should consider "in determining whether the child's parents are willing and able to provide the child with a safe environment." TEX. FAM. CODE § 263.307(b) (listing thirteen factors including "child's age and physical and mental vulnerabilities" and "willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time"); *In re A.C.*, 560 S.W.3d at 631 n.29.

Proving acts or omissions related to a predicate ground for termination does not relieve the Department of its burden to prove that termination is in the child's best interest, "but the same evidence may be probative of both" inquiries. *In re A.C.*, 560 S.W.3d at 631–32. The Department is not required to prove all the *Holley* factors as a condition precedent to termination of a parent's rights. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002); *In re A.J.D.-J.*, 667 S.W.3d 813, 822 (Tex. App.—Houston [1st Dist.] 2023, no pet.) (stating that *Holley* factors "are not exhaustive, no one factor is controlling, and a single factor may be adequate to support a finding that termination of the parent-child relationship is in a child's best interest on a particular record").

Neither Diedra nor Michelle testified at trial, so there was no direct evidence about their desires.[10] The Child Advocates report included a note that the representative attended a visitation with the girls and Mother in June 2024, Mother was "engaged and attentive," and everyone appeared excited and like they enjoyed each other's company. Mother did not visit the children after that visit, and by September 2024, the children no longer asked about Mother.

As discussed above, the children were living in filthy conditions at the time of their removal. They were not enrolled in school, they did not know the alphabet or colors, and the Department had concerns about their socialization levels. Michelle had a medical condition that had required significant care when she was younger, and although she had had reconstructive surgery, she still struggled with incontinence and frequently wore diapers or Pull-Ups. A possibility existed that Michelle might need an additional surgery, but the Department and Michelle's foster mother had been unable to explore this avenue because Mother had not provided all Michelle's medical records.

Following their removal from Mother's care, both girls had engaged in therapy, and their communication skills had markedly improved. Both girls were

---

[10]   During closing arguments, the trial court asked the children's attorney ad litem whether he had discussed termination of Mother's parental rights with the children. Counsel stated that the children "don't ask about their mother at all," they are "happy where they are," they "want to remain there," they "love this foster mother," and they "love the house that they're in."

"able to speak in full sentences and express themselves," and the Department's concerns about their socialization had decreased. They had also made substantial progress academically. Although Diedra had not yet caught up to where she should be for her age level, she had made progress, and she did not have any intellectual or learning disabilities. The understanding of her school officials was "she is capable of completing the work, it's just that she's kind of catching up to it."

Michelle had continuing difficulties with incontinence, which made it difficult for her to participate in swimming lessons with Diedra. But it did not affect her ability to go to school. She participated in class and had good grades. She had learned colors, she was "attempting to spell sight words," and she was learning to write.

As we have already discussed, Mother had a lengthy history with substance abuse, the criminal justice system, and the Department. Eight of Mother's ten children had been involved with the Department. She acknowledged using methamphetamine as recently as two months before trial, and she had a pending criminal charge for methamphetamine possession. Although Mother believed that she would be released from incarceration later that month, that was speculative, and there was no indication of how that pending case might be resolved. She testified that upon her release, she planned to live in a trailer on a friend's property with the girls and one of her adult sons, but there was no evidence of when she would be released.

Mother testified that she completed a parenting class, but there was no evidence that she completed any of the other requirements of her service plan. The service plan identified Mother's ongoing substance abuse as an area of concern, and it required her to complete a substance abuse assessment and counseling. The record contains no evidence that Mother did so or that she had recently participated in substance abuse treatment. Mother acknowledged that she participated in such a program in 1999 in connection with a criminal case, but it is undisputed that Mother has continued to use illegal drugs. Mother also testified that she received training related to Michelle's care after her reconstructive surgery, but there is no evidence that Mother has received any training on any current medical issues either child might have or training related to their educational and therapeutic needs.

The removal affidavit contained several references to bizarre behavior on Mother's part, including a statement by a Department investigator that Mother "was unable to focus on the questions being asked and she continued to ramble about things that did not make sense or had to do with the conversation." As an additional example, Mother testified that she did not enroll the children in school because she was afraid of HPD. She explained that HPD officers shot at her five years before trial, while her daughters were present, because she had stolen something from the officers. She acknowledged that she had been under psychiatric care in the past and that she took numerous psychoactive medications. The Department, concerned about

27

Mother's mental state, required her to undergo a psychosocial, psychiatric, and psychological evaluation and participate in individual counseling. The record contains no evidence that Mother completed these service plan requirements.

In arguing that the Department did not prove that termination of her rights was in the children's best interest, Mother focuses on the fact that the children were not placed in an adoptive home. Instead, the foster parents were "undecided" about whether they wanted to adopt the children, and the Child Advocates representative believed it was worthwhile to look into a relative placement for the children.

Evidence about the Department's placement plans and adoption are relevant to best interest. *In re C.H.*, 89 S.W.3d at 28. But "the lack of evidence about definitive plans for permanent placement and adoption" is not a dispositive factor in the inquiry. *Id.* "[O]therwise, determinations regarding best interest would regularly be subject to reversal on the sole ground that an adoptive family has yet to be located." *Id.*

The Child Advocates representative testified that the children's foster mother was considering adoption and was "open" to that possibility. Even if she did not adopt, the foster mother "wants the children to remain in her home" on a permanent basis. The children were "thriving" in this placement, and the placement was acceptable to the Department. The trial court therefore heard evidence that although

adoption plans were not definitive, the foster mother wanted the children to remain in her home, which would give them permanence and stability.

We conclude that "the lack of evidence about definitive plans for permanent placement and adoption" of the children does not outweigh the evidence that terminating Mother's parental rights is in Diedra and Michelle's best interest. *See id.* Mother loves her children and desires to be reunited with them. But she has a lengthy history of substance abuse, and there is no evidence that she has engaged in services or programs to treat that substance abuse. At the time of trial, she also had a pending felony drug charge and had not demonstrated an ability to maintain stable living conditions. Although Diedra and Michelle are not very young children, Michelle has ongoing medical needs, and both girls require therapy and effort to ensure that their educational and socialization progress continues. The trial court could have concluded from the evidence before it that Mother could not provide the stability that the girls needed.

Considering all the evidence, including disputed evidence that a reasonable factfinder could not have credited in favor of its best interest finding, we conclude that the trial court reasonably could have formed a firm belief or conviction that termination of Mother's parental rights was in Diedra and Michelle's best interest. We hold that legally and factually sufficient evidence supports the trial court's best interest finding.

We overrule Mother's second issue.

## Conclusion

We affirm the trial court's decree terminating Mother's parental rights to Diedra and Michelle.


David Gunn
Justice

Panel consists of Justices Rivas-Molloy, Gunn, and Caughey.